**Charles E. BUTCHER, II, Appellant**

v.

**The STATE of Texas**

**NO. PD–1662–13**

Court of Criminal Appeals of Texas.

Delivered: January 28, 2015

Rehearing Denied March 18, 2015

---

Alexander L. Calhoun, for Appellant.

Rosa Theofanis, for The State of Texas.

### OPINION

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., KEASLER, ALCALA, RICHARDSON, YEARY, and NEWELL, JJ., joined.

The punishment level for aggravated kidnapping is reduced from a first-degree felony to a second-degree felony if the kidnapper "voluntarily releases the victim in a safe place." *See* TEX. PENAL CODE § 20.04(d). The court of appeals concluded that the evidence was legally and factually sufficient to support the jury's rejection of Appellant's mitigating defense of release in a safe place. *See Butcher v. State,* No. 11–11–00288–CR, 2013 WL 5891603, at *9 (Tex.App.–Eastman Oct. 31, 2013) (mem.op.) (not designated for publication). We granted review to examine the holding of the court of appeals,[1] and because we agree with the judgment of the court of appeals, we shall affirm.

---

1. The ground for review states,

 Whether the Court of Appeals' decision regarding the legal and factual sufficiency of the jury's rejection of Petitioner's punishment issue under Tex. Penal Code § 20.04(d) was substantively unreasonable in light of the legislative incentive to promote the release of kidnap victims under circumstances in which assistance is reasonably available.

On September 24, 2009, in the pre-dawn hours, the nine-year-old complainant (JG) was walking alone down a long, dark, desolate driveway by herself from her condominium complex to her school bus stop. Appellant approached her from behind, grabbed her around the waist with one arm, covered her mouth with his other hand, and threatened to cut her with a knife if she screamed.[2] Appellant then put JG on the floorboard of his truck and drove her to his apartment. While she was in Appellant's car, JG reached into her backpack claiming to look for a snack, but she grabbed her mobile phone to seek help. Because it was still dark outside, Appellant saw the light from JG's phone when she activated it, and he took it from her. He then pried the battery out with a knife.[3] Once at Appellant's apartment, JG was put into a closet with her hands bound. After eight hours Appellant decided to release JG. He put her back on the floorboard of his truck and drove her to an apartment complex near where she lived. But when she told him that she did not know how to get home from where they were, Appellant took her back to the site of the kidnapping and released her there.

JG returned home to an empty house: her mother was not there because she was at the police station. JG was unable to call anyone for help because Appellant still had her mobile phone, and JG and her mother did not have a home phone. JG walked to a neighbor's house and used their telephone to call her mother. A little while later, her mother and police arrived.

CONSTRUING "SAFE PLACE"

Section 20.04 of the Texas Penal Code deals with aggravated kidnapping, and it states,

(a) A person commits an offense if he intentionally or knowingly abducts another person with the intent to:

(1) hold him for ransom or reward;

(2) use him as a shield or hostage;

(3) facilitate the commission of a felony or the flight after the attempt or commission of a felony;

(4) inflict bodily injury on him or violate or abuse him sexually;

(5) terrorize him or a third person; or

(6) interfere with the performance of any governmental or political function.

(b) A person commits an offense if the person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense.

(c) Except as provided by Subsection (d), an offense under this section is a felony of the first degree.

(d) At the punishment stage of a trial, the defendant may raise the issue as to whether he voluntarily released the victim in a safe place. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree.

TEX. PENAL CODE § 20.04.

 When construing a statute, we first look to its literal language to ascertain its meaning. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991). If the language of the statute is plain, then

---

**2.** Although the defense disputed at trial whether Appellant held the blade of the knife against JG's throat, she testified that the knife felt "cold" against her skin. Other record evidence showed that the blade was sufficiently close to her throat that her DNA was found on the blade.

**3.** JG's mother testified that she tried to track her daughter's location using the Global Positioning System but was unable to locate her phone.

we interpret the statute according to that plain language. However, if the language of the statute is ambiguous or the plain meaning would lead to absurd results, then we examine extratextual sources to discern the meaning of the statute. *See Brown v. State*, 98 S.W.3d 180, 183 (Tex.Crim.App. 2003). We employ these rules of statutory construction to fulfill this Court's constitutional duty to construe the meaning of a particular statute in the way intended by the legislators who enacted the law. *See id.*; *Boykin*, 818 S.W.2d at 785–86.

### A. Arguments of Appellant

■ Appellant argues that certain facts adduced at trial supported his affirmative defense. For example, the fact that JG was released during the day, that she was released to the location from where she was abducted, that her mother would allow her to walk to and from the school bus stop by herself before this incident, that JG did not ask a passing mailman for help after she was released, and that JG's mother described JG as independent. However, we do not agree with Appellant that those facts warrant reversing the judgment of the court of appeals or the determination of the jury.

For example, the fact that Appellant released the complainant during the day is not dispositive of whether a place is "safe"; many places that are dangerous at night remain dangerous during the light of the day. In addition, other relevant facts in this case included that the complainant was a nine-year-old girl; she had lived at that condominium complex for only three months; Appellant released JG without her mobile phone, thus preventing her

from seeking immediate help; and after being released, JG returned home to an empty home and had to leave it—after being kidnapped that morning near her home at knife point—to seek help. Also, after JG was kidnapped, her mother and JG no longer felt safe at the condominium complex, and the school adjusted the bus route to pick up and drop off JG directly in front of her condominium unit. Finally, although JG testified that she went to the home of a neighbor whom she knew and was comfortable with, she also did not ask for the neighbor's help despite their familiarity. Instead, she asked to use the phone to call her mother. Thus, while it was possible to infer that JG may have felt safe once she came upon the mailman because she did not ask for help, it is equally possible to infer that JG did not want to ask a stranger, or even a neighbor she was comfortable with, for help after being kidnapped by a stranger that morning so near her home. Moreover, a factfinder could infer that even an independent nine-year-old girl would be afraid to ask a passerby for help after suffering severe trauma by being kidnapped, having a knife held to her throat, and held, bound, for eight hours against her will.[4]

### B. The term "safe place" is ambiguous, and the determination of whether a place is safe should be made on a case-by-case basis.

We conclude that the term "safe place" as used in Section 20.04(d) of the Texas Penal Code is ambiguous because it is not defined in the Texas Penal Code and the term is susceptible to different meanings

---

4. This is especially true after the punishment testimony of Dr. William Lee Carter that kidnapping—even when there is no physical injury—is categorized as one "the most violent types of offenses," next to murder and rape. But in this case, Appellant actually acted violently and used a deadly weapon to kidnap JG, and JG's DNA was recovered from the blade of the knife.

based on the facts of each case.[5] *See Brown,* 98 S.W.3d at 183 (holding that the term "voluntarily" was ambiguous as used in the language of the aggravated-kidnapping statute because it was "susceptible to different meanings, some of which would support holding that appellant's release of the victim was voluntary and some of which would support a contrary decision"). Likewise, we must resort to extratextual sources to determine the intent of the enacting legislators in their use of "safe release" defense.

In *Brown,* this Court exhaustively reviewed the legislative history of the kidnapping statutes in Texas. *See Brown,* 98 S.W.3d at 184–87. We review that history, as it is germane to the issue of safe release.[6] The origins of the modern-day defense of release in a safe place can be traced back to the 63rd Legislature and its adoption of the 1973 Penal Code. Section 20.04 dealt with aggravated kidnapping, and subsection (b) was the safe-release

defense. *See* Acts of May 25, 1973, 63rd Leg., R.S., ch. 399, § 1, 1973 Tex. Gen. Laws 915, 915 (current amended version at Tex. Penal Code § 20.04(d)).[7] And while many provisions of the new penal code were debated extensively, the Legislature spent relatively little time discussing what may constitute a safe place or how to define the term "voluntarily release"— which was the subject of this Court's opinion in *Brown.* *See Brown,* 98 S.W.3d at 182. However, three comments were made with respect to "safe place," and those were that leaving a person in twenty-degree weather in snow or tied to railroad tracks would not be a safe place, and that the determination of whether a place is a safe for purposes of the aggravated-kidnapping statute will usually be a fact-specific inquiry. We note that the case-by-case analysis suggested during the debates of the Legislature is supported by the examples the Legislature discussed and our conclusion that whether a place is

---

**5.** No "place" can be definitively labeled "safe" because whether a place can be described as safe depends on the circumstances. *See, e.g.,* Black's Law Dictionary 1536 (10th ed.2014) (defining the word "safe" as "[n]ot exposed to danger; not causing danger ...." or "[u]nlikely to be overturned or proved wrong."). We find the first definition the most helpful in the context of safe release, "[n]ot exposed to danger[.]"

With respect to the circumstances of the release, it may be safe to release an adult in a place that would be unsafe for a child, or a place that may be unsafe to release a mentally or physically disabled person could be safe to release a person not so disabled. Moreover, although releasing a kidnapping complainant at a hospital where the complainant can receive medical treatment and police assistance will probably always be safe, leaving a kidnapping complainant at a closed or vacant hospital likely would not be considered safe.

**6.** Texas prohibited kidnapping and abduction as early as the adoption of the 1856 Penal Code. *See* Act of Aug. 28, 1856, 6th Leg.,

R.S., art. 1, arts. 515, 521, *reprinted in* 4 H.P.N. Gammel, *The Laws of Texas 1822–1897,* at 1043–44 (Austin, Gammel Book Co. 1898).

**7.** The 1973 version of the aggravated kidnapping statute stated:

(a) A person commits an offense if he intentionally or knowingly abducts another person with the intent to:

(1) hold him for ransom or reward

(2) use him as a shield or hostage

(3) facilitate the commission of a felony or the flight after the attempt or commission of a felony

(4) inflict bodily injury on him or violate or abuse him sexually

(5) terrorize him or a third person, or

(6) interfere with the performance of any governmental or political function

(b) An offense under this section is a felony of the first degree unless the actor voluntarily releases the victim alive and in a safe place, in which event it is a felony of the second degree.

Tex. Penal Code § 20.04 (1973).

safe necessarily turns on the circumstances of each case.

In addition, although the 1973 Practice Commentary to Section 20.04 notes that the aggravated-kidnapping provision was modeled after Section 212.1 of the Model Penal Code,[8] neither the 1973 Practice Commentary nor the comments to the Model Penal Code define "safe place." *See* Practice Commentary to Section 20.04, 259–61 (1989); Model Penal Code, Section 212.1 (Official 1962 Draft and Revised Comments) (The American Law Institute 1980).

In 1993, the 73rd Legislature amended Section 20.04 of the Texas Penal Code. Act of May 31, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3615, 3615 (the safe-release defense was moved to newly created subsection (c), the defense was turned into an affirmative defense, and the word "alive" was removed as a requirement of the defense). However, the amendments and accompanying legislative history reveal nothing about how the term "safe place" in the aggravated-kidnapping statute should be defined.[9] *See* Senate Comm. on Crim. Justice, Bill

Analysis, Tex. S.B. 1067, 73d Leg., R.S., at 4 (1993) (removing the word "alive" but noting that the 1993 amendments "make[ ] a nonsubstantive change" that "[a]llows a defendant, at the punishment stage of a trial, to raise the issue as to whether he voluntarily release the victim in a safe place . . ."). The next session, the 74th Legislature amended Section 20.04 of the Texas Penal Code again. Acts of May 29, 1995, 74th Leg., R.S., ch. 318, § 4, 1994 Tex. Gen. Laws 2735, 2735–36 (moving the safe-release defense to the new subsection (d) without substantive change and making subsection (c) a new offense). However, as with the 1993 amendments, the 1994 amendments do not shed any light on how the Legislature intended to define the phrase "safe place." *See* Senate Comm. on Crim. Justice, Bill Analysis, Tex. S.B. 15, 74th Leg., R.S. (1995) (noting that use or exhibition of a deadly weapon during an abduction would be added as an offense in subsection (c) and creating subsection (d) while redesignating subsections (b) and (c)). After examining the legislative history and debates concerning what a "safe place" is, we conclude that the Legislature intended for the definition of "safe place"

---

8. Section 212.1 of the Model Penal Code stated,

> A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he was found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following purposes:
> (a) to hold for ransom or reward, or as a shield or hostage; or
> (b) to facilitate commission of any felony or flight thereafter; or
> (c) to inflict bodily injury on or to terrorize the victim or another; or
> (d) to interfere with the performance of any governmental or political functions.
> Kidnapping is a felony of the first degree unless the actor voluntarily releases the victim alive and in a safe place prior to trial, in which case it is a felony of the second

degree. A removal or confinement is unlawful within the meaning of this Section if it is accomplished by force, threat or deception, or, in the case of a person who is under the age of 14 or incompetent, if it is accomplished without the consent of a parent, guardian or other person responsible for general supervision of his welfare.
Model Penal Code, Section 212.1 (Official 1962 Draft and Revised Comments) (The American Law Institute 1980).

9. One concern of the opponents to amending the 1973 Penal Code in the Texas House of Representatives was that changing the safe-release defense to an affirmative defense to be raised at punishment might have "seriously compromis[ed] constitutional rights." *See* House Comm. on Crim. Jurisprudence, Bill Analysis, Tex.C.S.S.B. 1067, 73d Leg., R.S., at 20 (1993).

to be a fact-specific inquiry made on a case-by-case basis, considering the totality of the circumstances.

### C. The opinion of the court of appeals and determining whether a place is safe.

To determine whether the place at which Appellant left the complainant was safe, the court of appeals stated that it would rely on seven factors developed by the Corpus Christi Court of Appeals: (1) the remoteness of the location, (2) the proximity of help, (3) the time of day, (4) the climate, (5) the condition of the complainant, (6) the character of the location and surrounding neighborhood, and (7) the complainant's familiarity with the location or neighborhood. *See Butcher*, 2013 WL 5891603, at *8; *Williams v. State*, 718 S.W.2d 772, 774 (Tex.App.–Corpus Christi 1986), *aff'd in part and rev'd in part on other grounds*, 851 S.W.2d 282 (Tex.Crim. App.1993). The court also explained that the factors it identified are "only aids" to be used after "considering all the surrounding circumstances existent in the case[.]" *Butcher*, 2013 WL 5891603, at *8. Applying those principles to the case at hand, the court of appeals concluded that the jury properly determined that the place at which Appellant released the complainant was not safe in this case because, although the complainant was released at a location near to that of the abduction, there was testimony that the area was "desolate," the complainant was dropped off in the middle of the road, Appellant kept the complainant's mobile phone, and the complainant's family did not have a phone at their house. *Id.* at *8–9. The

court of appeals also rejected Appellant's argument that releasing JG to the place from where she was kidnapped automatically supported a conclusion that the complainant was released in a safe place. The court distinguished a case in which the Fourteenth Court of Appeals concluded that a kidnapper released a college student in a safe place when he was released to the place from where he was kidnapped. *See Storr v. State*, 126 S.W.3d 647 (Tex.App.– Houston [14th Dist.] 2004, pet. ref'd). The court found the instant case distinguishable from *Storr* because, in that case, the college-aged complainant was released at a post office near his college during business hours, and the complainant had transportation available. *Id.* at 652–53. In contrast, the court of appeals noted that the complainant in this case was a nine-year-old girl, she was returned to the middle of a street, had no access to a phone or transportation, and "she returned home to an empty house." *Butcher*, 2013 WL 5891603, at *9.

■ While we have never expressly addressed the propriety of the seven factors identified by the court of appeals, we take this opportunity to do so now. We agree that reviewing courts may consider the seven factors listed by the court of appeals. However, we caution reviewing courts that the factors identified by the court of appeals are merely nonexclusive [10] aids that may be considered to guide its determination under the totality of the circumstances of each case whether the place at which the complainant was released was "safe." With that background, we now turn to the court of appeals's assessment of the legal sufficiency and its application

---

10. Because we hold that the determination of a "safe place" should be made considering the unique facts of each case, factors other than the seven identified by the courts of appeals may also be considered when reviewing a determination of whether a place is "safe" for purposes of Section 20.04(d) of the

Texas Penal Code. For example, the court of appeals in this case determined that the age of the complainant in this case was significant. In another case, other factors may be important such as the competency of the complainant or whether the complainant has a physical disability.

of the factual-sufficiency standard of review to the jury's finding rejecting Appellant's affirmative defense.

### LEGAL AND FACTUAL SUFFICIENCY OF MITIGATING AFFIRMATIVE DEFENSES

█ Affirmative defenses may be evaluated for legal and factual sufficiency, even after this Court handed down its opinion in *Brooks v. State*, 323 S.W.3d 893 (Tex.Crim.App.2010), which abolished factual-sufficiency review as it applies to criminal convictions. In a legal-sufficiency review of an affirmative defense, reviewing courts should first assay the record for a scintilla of evidence favorable to the factfinder's finding and disregard all evidence to the contrary unless a reasonable factfinder could not. *See Matlock v. State*, 392 S.W.3d 662, 669–70 (Tex.Crim.App.2013). The finding of the factfinder rejecting a defendant's affirmative defense should be overturned for lack of legal sufficiency only if the appealing party establishes that the evidence conclusively proves his affirmative defense, and "no reasonable [factfinder] was free to think otherwise." *Id.* at 670.

█ In a factual-sufficiency review of a finding rejecting an affirmative defense, and unlike in a legal-sufficiency review, courts examine the evidence in a neutral light. *Id.* at 671. A finding rejecting a defendant's affirmative defense cannot be overruled unless, "after setting out the relevant evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.*

### A. The court of appeals's analysis that the evidence was legally and factually sufficient was not unreasonable.

The jury rejected Appellant's mitigating affirmative defense. The court of appeals affirmed the legal sufficiency of that finding. We agree. The record contains much more than a scintilla of evidence that the place at which Appellant released the complainant was not safe. To prevail on his legal-sufficiency claim, Appellant had to establish that the evidence conclusively proved his affirmative defense such that "no reasonable [factfinder] was free to think otherwise." He failed to do so, despite the fact that the court of appeals did not assess every single piece of evidence and state whether it supported Appellant's mitigating affirmative defense. Therefore, we affirm the judgment of the court of appeals that the evidence was legally sufficient for the jury to reject Appellant's defense.

In addition, we hold that the court of appeals correctly applied the factual-sufficiency standard of review when it concluded that that the finding of the jury rejecting Appellant's affirmative defense was not so much "against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* While this Court may not agree with every factfinder's determination of whether a place is safe or attach the same importance to each fact that the jury in this case did, we are loathe to substitute our own judgment for that of the factfinder simply because we may have reached a different result under the same facts. However, in this case, there was ample evidence that a reasonable jury could have concluded that the place at which Appellant released JG was not "safe" considering all of the surrounding circumstances. Moreover, the fact that some facts in the record *could* support Appellant's affirmative defense does not render the factual sufficiency of the jury's decision manifestly unjust, conscience-shocking, or clearly biased.

We affirm the judgment of the court of appeals.

NEWELL, J., filed a concurring opinion.

MEYERS, J., filed a dissenting opinion.

JOHNSON, J., filed a dissenting opinion.

## OPINION

Newell, J., filed a concurring opinion.

I join the majority opinion, but I write separately to address my concern that too much focus upon the need to preserve the incentive nature of the statute obscures the determination of whether a particular location is "safe."

As both the majority and the dissenting opinions demonstrate, it is exceedingly difficult to come up with a "one-size-fits-all" definition for what constitutes a safe place. Consequently, this Court has settled upon the dynamic and non-exhaustive list of factors set out in *Williams v. State* to help guide courts of appeals on a case-by-case basis when determining if the circumstances suggest that a particular location was "safe." While this approach might result in a more malleable definition of "safe," courts of appeals have used it successfully for many years without a great deal of conflict or confusion. *See, e.g., Woods v. State*, 301 S.W.3d 327, 331–32 (Tex.App.–Houston [14th Dist.] 2009, pet. ref'd.) (holding evidence factually sufficient after examining *Williams* factors); *Lavarry v. State*, 936 S.W.2d 690, 696 (Tex.App.–Dallas 1996, pet. ref'd.) (same); *Rodriguez v. State*, 766 S.W.2d 360, 361 (Tex.App.–Texarkana 1989, pet. ref'd.) (same); *Williams v. State*, 718 S.W.2d 772, 774 (Tex.App.–Corpus Christi 1986), *aff'd in part and rev'd in part on other grounds*, 851 S.W.2d 282 (Tex.Crim.App.1993).

But whatever else a safe place might mean, it must mean a safe place for the victim; the inquiry does not include whether a location is safe for the defendant. The legislature's primary concern when drafting this statute was the victim's safety from both actual harm and the risk of harm. *Brown v. State*, 98 S.W.3d 180, 185 (Tex.Crim.App.2003) (noting that the primary concern for the statute was the victim's safety and considering examples such as a victim tied to railroad tracks or being left in twenty-degree weather in the snow). The legislative history does not reveal any consideration of a sliding scale of acceptable risk for the victim so that a defendant might be incentivized to release his captive.

Rather than qualify the term "safe place," the legislature set the incentive for defendants at a reduction in the range of punishment. TEX. PENAL CODE ANN. § 20.04(d) (West 2013); *see also Brown*, 98 S.W.3d at 185 ("The 1973 Practice Commentary to Section 20.04 also states that former Section 20.04(b) reflected 'the Model Code's overriding concern for the victim's safety' because like 'prior art. 1177a before its amendment in 1933, [former] Section 20.04(b) encourages the victims' safe return by reducing the penalty one grade if he is released alive and in a safe place.' "). The statute does not guarantee immunity from arrest or prosecution. *Cf.* TEX. PENAL CODE ANN. § 22.041(h) (West 2013) ("It is an exception to the application of this section that the actor voluntarily delivered the child to a designated emergency infant care provider under Section 262.302, Family Code."). It is true that the legislature passed the statute to encourage the safe release of kidnap victims, but that incentive should not be used as an undetectable extension charm on the definition of "safe." [1] If this statutory scheme ultimately provides too little encourage-

---

1. J.K. ROWLING, HARRY POTTER AND THE DEATHLY HALLOWS (Arthur A. Levine 2009).

ment to overcome a defendant's fear of apprehension such that he will seek to take advantage of this statute, this Court should not be required to sweeten the deal by adjusting its standard for defining a safe place.

As far as disincentive is concerned, setting a standard that focuses solely upon the victim's safe return is no more onerous than the statutory renunciation defense, and in some ways it is less so. TEX. PENAL CODE ANN. § 15.04(a) (West 2013) ("It is an affirmative defense to prosecution under Section 15.01 that under circumstances manifesting a voluntary and complete renunciation of his criminal objective the actor avoided commission of the offense attempted by abandoning his criminal conduct or, if abandonment was insufficient to avoid commission of the offense, by taking further affirmative action that prevented the commission."). Section 15.04 not only requires that a defendant renounce his criminal objective out of genuine repentance or change of heart, it also requires the defendant to take affirmative steps to prevent the commission of an offense. *Id.*; *see also* Practice Commentary to § 15.04 (Vernon 1974) ("Subsection (c) limits the renunciation defense to those changes in the actor's purpose that evidence repentance or change of heart."). In contrast, Section 20.04 does not require a showing of the defendant's motive in releasing the victim or that he take affirmative steps to undo the consequences of his conduct. TEX. PENAL CODE ANN. § 20.04(d) (West 2013); *see also Brown*, 98 S.W.3d at 188 (Meyers, J., concurring) (noting that voluntary release does not consider the defendant's subjective motives). No one has yet complained that Section 15.04 is a dead letter, so it seems premature to write the obituary for Section 20.04(d) based upon this one opinion.

Section 20.04(d) simply requires a showing that the defendant released the victim at a location where the victim was secure or protected from both harm and the risk of harm. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1998 (2002) (defining "safe" as "secure from threat of danger, harm, or loss"). There must be some overt and affirmative act that brings home to the victim that he or she has been fully released from captivity in a place and manner which realistically conveyed to the victim that he or she was then freed from captivity and in circumstances and surroundings wherein aid was readily available. *See, e.g., Harrell v. State*, 65 S.W.3d 768, 772 (Tex.App.–Houston [14th Dist.] 2001, pet. ref'd.). While this is certainly a close case, I agree with the majority that the jury's rejection of appellant's claim that he had done so was not clearly wrong or manifestly unjust.

With these observations, I join the majority.

### DISSENTING OPINION

Meyers, J., filed a dissenting opinion.

The majority and concurring opinions both agree with the court of appeals that the evidence in this case was legally and factually sufficient to reject the defendant's claim that he voluntarily released the victim in a safe place. The majority, however, has characterized the safe place provision as an affirmative defense and analyzed it under the (likely incorrect) standard discussed in *Matlock v. State*, 392 S.W.3d 662 (Tex.Crim.App.2013). The safe place provision, however, even though the defendant has the burden to prove it, is not an affirmative defense; it is a mitigation issue. Therefore, the standard for analyzing affirmative defenses should not be employed. The defendant had the burden to prove he voluntarily released the victim in a safe place, and we should now

be asking whether the defendant met this burden. In answering this question, however, it is problematic to have the jury deciding, from an objective standpoint, rather than from the defendant's subjective view, whether the place in which the victim was released was safe. Allowing a jury to decide after the fact whether a kidnapper acted in line with the provision is incompatible with the spirit and purpose of the statute, which is to encourage kidnappers to safely release their subjects. Therefore, the charge to the jury on the safe place provision should have been based upon whether the defendant perceived the place to be safe and whether that perception was rational and justified. Today's holding renders the provision useless, as this case seems to exemplify precisely the circumstances to which this provision should apply.

Rather than using the laundry list of factors discussed in the majority's opinion in trying to determine whether a place is safe or not, we should be looking to whether the defendant was attempting to comply with the statute. Because a kidnapper will obviously not be aware of these factors, I do not believe that looking at them after-the-fact is a valid way of analyzing this issue. Using this method means that even a defendant who made a good-faith effort to safely return his victim may not be able to employ this defense. Irrespective of whether a location is absolutely safe, if a defendant avoided what he would consider to be unsafe places, this defense should apply. Appellant, for example, drove JG back to where he found her after she explained that she did not know how to get home from the first location he released her. This demonstrates a clear intent to return the victim safely, and allowing a jury to reject this defense undermines the Legislature's intent in promulgating the provision.

Further, when a defendant returns their kidnapping victim to the precise place from which the victim was taken, there should not have to be a determination at all as to whether the location is safe or not, as long as the victim was voluntarily present in that place. Regardless of whether a jury would determine the location to be safe, it is where the victim chose to be (or in this case, where the victim's parent chose for the child to be). In these situations, the determination of whether the location is safe or not has already been made by the victim, or the victim's guardian, with no input from the defendant. If a woman is kidnapped from her home where she lives with her violently abusive husband, would such a defendant not be able to use this affirmative defense when he returns the woman to her own home? I believe we should continue to encourage defendants to return their victims, rather than discourage such an act with decisions such as the majority's today.

Unless a variance is shown, such as the victim not voluntarily being in the place he or she was taken from, I believe it is unreasonable for any factfinder to reject this mitigating circumstance of safe release and that such a verdict is manifestly unjust. For the foregoing reasons, I would reverse the decision of the court of appeals and, therefore, I respectfully dissent.

### DISSENTING OPINION

Johnson, J., filed a dissenting opinion.

I respectfully dissent. I believe that the court of appeals incorrectly applied the standard of review for factual sufficiency in this aggravated kidnapping case. The term "safe place" is not defined in the statute and is open to interpretation depending on the facts of each case. Therefore, the court should have considered the legislative history and intent of the safe-

release defense. The critical question in this case is whether appellant did what the legislature intended the safe-release defense to encourage him to do. Because the lower court did not answer this question, I would reverse and remand to the court of appeals to apply the correct standard.

## I.

Appellant abducted a nine-year-old girl, J.G., at knife point while she was walking down the driveway from her condominium complex to the school bus stop early in the morning. J.G. walked to and from that bus stop every day, which was at the end of the private drive leading to the complex. There was a "park-like setting" on one side of the drive and an under-construction shopping center on the other. The drive was an eighth to a quarter of a mile long and it took J.G. five to ten minutes to walk down the driveway every day. The drive did not normally have much traffic and a police officer described the area as middle class with no reputation for violent crime.

After threatening her with the knife to not scream, appellant put J.G. in his truck and she tried to use her cell phone to call for help. Appellant took the phone and removed the battery. He drove J.G. to his apartment, where he tied her hands and placed her inside of a bedroom closet with a television. J.G. spent the day in the closet watching "SpongeBob" and appellant twice fed her when she said that she was hungry. Later in the afternoon, J.G. told appellant that her mother would be angry if she did not come home soon. As a result, appellant drove her to the apartments next to the condominium complex where she lived. J.G. told appellant that she did not know how to get home from that location, so he drove her back to the same private drive from which he initially took her, and she walked home.

On the way up the drive, J.G. passed a mailman and asked for the time, but she did not ask him for help. She went back to her condo but she did not have her cell phone and her condo did not have a landline phone. J.G., characterized by her mother as "independent" and "capable," then walked to a neighbor's condo and asked to use the phone, but she did not suggest that she needed help. J.G. called her mother, who at that time was at the police station.

Appellant was charged with aggravated kidnapping, a first-degree felony. At trial, appellant raised the affirmative defense of safe release, which would reduce the offense to a second-degree felony. The jury rejected appellant's defense and convicted him of first-degree aggravated kidnapping. The jury then found the enhancement paragraphs to be true and assessed punishment at life imprisonment and a $10,000 fine.

On appeal, appellant argued that the evidence was legally and factually insufficient to support the jury's rejection of his safe-release defense. The Eleventh Court of Appeals affirmed and held that the evidence was both legally and factually sufficient to support the verdict because (1) J.G. was released at the same location from which she was kidnapped, (2) the location of release was desolate, (3) appellant took J.G.'s cell phone, (4) J.G. was nine years old and was returned to the "middle of a street," and (5) she returned to an empty house.[1]

## II.

When reviewing a jury's rejection of an affirmative defense, courts apply both a

---

1. *Butcher v. State,* No. 11–11–00288–CR, 2013 WL 5891603, at *9 (Tex.App.–Eastland Oct. 31, 2013) (mem.op.) (not designated for publication).

legal- and factual-sufficiency standard.[2] First, applying the legal-sufficiency standard, we determine if more than a mere scintilla of evidence supported the jury's finding that the defendant did not release the complainant in a safe place.[3] Furthermore, we disregard all evidence contrary to the jury's finding unless a reasonable factfinder could not disregard such evidence.[4] If no evidence supports the jury's finding, then we search the record to determine whether the defendant established his affirmative defense as a matter of law.[5]

Second, as to factual sufficiency, although this Court does not have jurisdiction to "pass upon the weight and preponderance of the evidence or 'unfind' a vital fact," this Court may determine whether the courts of appeals applied the proper standard of review.[6] Evidence may be factually insufficient in two ways: after review in a neutral light, "(a) the evidence is factually insufficient to support a finding of a vital fact, or (b) the finding of a vital fact is so contrary to the great weight and preponderance of the evidence as to be clearly wrong."[7] The first type of factual insufficiency occurs when the evidence is "simply too weak by itself to support a rational finding."[8] The second type occurs when there is evidence on both sides of the issue, some supporting and some weighing against the verdict, but-after balancing all of the evidence-the verdict is plainly wrong or manifestly unjust.[9]

In this case, the court of appeals applied the rule for the second type of factual insufficiency-whether the verdict was plainly wrong or manifestly unjust. The court used a factors test and held that the jury's rejection of appellant's affirmative defense was not so against the great weight of the evidence as to be manifestly unjust.[10] While the court did consider the facts weighing both for and against the safe-release defense, it did not analyze § 20.04—the pertinent kidnapping statute-and did not consider legislative intent.

### III.

Section 20.04(d) of the Texas Penal Code states that aggravated kidnapping is a first-degree felony unless the defendant establishes by a preponderance of the evi-

2. *Matlock v. State,* 392 S.W.3d 662, 667 (Tex. Crim.App.2013) (noting that affirmative defenses are reviewed under both legal- and factual-sufficiency even after this Court abolished factual-sufficiency review for criminal convictions in *Brooks v. State,* 323 S.W.3d 893 (Tex.Crim.App.2010)).

3. *See id.* at 669 (applying factual sufficiency to the affirmative defense of inability to pay child support).

4. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005) (modifying the legal-sufficiency standard of review to consider evidence contrary to the jury's finding only if a reasonable factfinder could not ignore it).

5. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

6. *Combs v. State,* 643 S.W.2d 709, 716 (Tex. Crim.App.1982) (quoting *Martin v. State,* 605 S.W.2d 259, 261 (Tex.Crim.App.1980)); *see also* Tex. Const. art. V, § 6 ("the decision of [the courts of appeals] shall be conclusive on all questions of fact brought before them on appeal or error").

7. *See Goodman v. State,* 66 S.W.3d 283, 285 (Tex.Crim.App.2001) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L. Rev. 361, 366 (1960)).

8. *Goodman,* 66 S.W.3d at 285.

9. *Id.* at 286. ("A reviewing court can only attribute the verdict to bias, irrationality, or some other peculiarity.").

10. *Butcher,* 2013 WL 5891603, at *8 (applying "safe place" factors elucidated in *Rodriguez–Flores v. State,* 351 S.W.3d 612, 636 (Tex.App.–Austin 2011, pet. ref'd)).

dence that he "voluntarily released the victim in a safe place."[11] If the safe-release defense is proven, the offense is lowered to a second-degree felony. The term "safe place" is not defined in the statute. Because the term is not defined and because it is susceptible to different meanings, we must look to the legislative history and extra-textual sources to determine the legislative intent behind the safe-release affirmative defense.[12]

We first discussed the history behind § 20.04 at length in *Brown v. State*.[13] In *Brown*, we noted that, in 1931, kidnapping for extortion or ransom was punishable by the death penalty unless the kidnapper returned the victim without serious bodily injury.[14] In 1933, the legislature removed the portion of the statute reducing the maximum punishment when the victim was returned without serious injury because it determined the provision was insufficient to deter would-be kidnappers.[15]

In response to the Charles Lindbergh, Jr., abduction and murder in 1932, many jurisdictions, like Texas, increased the penalty for kidnapping or "maintained a single broad offense punishable in terms suited to the most heinous kinds of conduct covered by it."[16] The Model Penal Code's kidnapping statute, § 212.1, was drafted to address some of the wild inconsistencies in the punishment of kidnapping between states.[17] The rationale behind the MPC statute was to punish the varying degrees of kidnapping appropriately.[18] The punishment should fit the crime.

The MPC commentary specifically notes that the "most difficult grading question is when kidnapping should be graded as a felony of the first degree" because most jurisdictions authorize life imprisonment for this offense.[19] The justification for such harsh punishment is the life-endangering nature of the offense. Therefore, the MPC statute was drafted on the premise that, if the most severe punishment is triggered once the victim has been harmed in some way, there must be an incentive for the kidnapper not to cause further harm.[20] The MPC, then, mandates that "while causing harm to the victim will aggravate the offense ... the actor may still escape the extreme sanctions of a first-degree felony by preserving the life of the victim and voluntarily releasing him alive and in a safe place prior to trial."[21] If the

11. TEX. PENAL CODE § 20.04(d) (2011).

12. *See Jordan v. State*, 36 S.W.3d 871, 873 (Tex.Crim.App.2001).

13. *Brown v. State*, 98 S.W.3d 180 (Tex.Crim. App.2003).

14. *Id.* at 184 (citing Acts 1931, 42nd Leg., p. 12, ch. 12, H.B. 244 codified as former Texas Penal Code, Article 1177a).

15. *Id.* (citing Acts 1933, 43rd Leg., p. 51, ch. 17, S.B. 36).

16. MODEL PENAL CODE § 212.1 cmt. 1 at 215–16 (Official 1962 Draft and Revised Comments) (The American Law Institute 1980) (noting that the abduction and murder of aviator Charles Lindbergh's infant son prompted nationwide legislative action).

17. *Id.* at 218–20. For example, the same behavior that would constitute misdemeanor false imprisonment in California, and thus be punishable by up to one year of incarceration, would constitute kidnapping and carry a discretionary death sentence in New York. *Id.* at 218–19.

18. *Id.* § 212.1 cmt. 2 at 220.

19. *Id.* § 212.1 cmt. 5 at 232–33.

20. *Id.* at 233.

21. *Id.* ("The effect of this scheme is to provide at every state an incentive to release the victim and not to inflict any further harm."); *see also* Note, *A Rationale of the Law of Kidnapping*, 53 COLUM. L.REV. 540, 550 (1953) (criticizing kidnapping statutes for failing to differentiate between intentional and accidental

victim is released, the offense is reduced to a second-degree felony.[22]

In 1973, the Texas Legislature reformulated the kidnapping statute and patterned it after Model Penal Code § 212.1.[23] The 1974 Texas statute provided that aggravated kidnapping "is a felony of the first degree unless the actor voluntarily releases the victim alive and in a safe place, in which event it is a felony of the second degree."[24] While the legislature did not define "safe place," the committee did discuss its application and noted that leaving a victim outside in the snow or tied to railroad tracks would not reduce the offense to a second-degree felony.[25] Like the MPC, § 20.04(b) was drafted with the primary concern being the victim's safety, and thus it provides incentive for the kidnapper to let the victim go.[26] In 1993, the legislature amended § 20.04 to make "voluntary release in a safe place" an affirmative defense that the defendant could present during the punishment phase of trial.[27]

## IV.

A factual-sufficiency review of the rejection of a safe-release defense must include both a review of the facts of the case and consideration of the reason the legislature included such a defense in the kidnapping statute. The legislature did not define "safe place" and the term is ambiguous, rendering an analysis of the legislative history necessary. Because the question of whether a place is "safe" is factually intensive, courts should take a case-by-case approach.[28]

In this case, the court of appeals applied a factors test to determine whether the jury's rejection of the safe-release defense was supported by legally and factually sufficient evidence: "[1] the remoteness of the location, [2] the proximity of persons who could aid or assist the victim, [3] the time of day, [4] the climatic conditions, [5] the victim's condition, [6] the character of the location or surrounding neighborhood, and [7] the victim's familiarity with the location or neighborhood."[29] While these factors may be useful in conducting suffi-

harm and arguing that sentences must be reduced to provide incentive to keep the victim alive).

22. MODEL PENAL CODE § 212.1 (Official 1962 Draft and Revised Comments) (The American Law Institute 1980).

23. See Brown, 98 S.W.3d at 185 (citing Practice Commentary to Section 20.04, 259–61 (1989)).

24. TEX. PENAL CODE § 20.04(b) (1974).

25. See Brown, 98 S.W.3d at 184; see, e.g., Hearings on S.B. 34 before the Senate Criminal Jurisprudence Subcommittee, 63rd Leg., R.S., on Feb. 20, 1973; Hearings on S.B. 34 before the Senate Criminal Jurisprudence Committee, 63rd Leg., R.S., on May 8, 1973.

26. Id. at 185 ("The 1973 Practice Commentary to Section 20.04 also states that former Section 20.04(b) reflected 'the Model code's overriding concern for the victim's safety' be-

cause like 'prior art. 1177a before its amendment in 1933, [former] Section 20.04(b) encourages the victim's safe return by reducing the penalty one grade if he is released alive and in a safe place.' ").

27. TEX. PENAL CODE § 20.04(c) (1993) (also removing the word "alive" from the defense).

28. See Wright v. State, 571 S.W.2d 24, 25 (Tex.Crim.App.1978); State v. Henderson, No. A12–1888, 2013 WL 5777886, at *3 (Minn.Ct. App. Oct. 28, 2013) (not designated for publication) (noting that Minnesota's kidnapping statute does not define "safe place" and that the jurors were instructed to rely on their own experience and common sense).

29. Rodriguez–Flores v. State, 351 S.W.3d 612, 636 (Tex.App.–Austin 2011, pet. ref'd); see also Nolan v. State, 102 S.W.3d 231, 238 (Tex.App.–Houston [14th Dist.] 2003, pet. ref'd); Lavarry v. State, 936 S.W.2d 690, 696 (Tex.App.–Dallas 1996, pet. dism'd).

ciency reviews, none are decisive, and they should not be applied in a rote manner. Furthermore, the purpose behind the safe-release affirmative defense is the most important consideration: Did the defendant affirmatively choose to release his victim and in a manner that was not likely to cause further harm?

The court of appeals should have analyzed whether appellant's actions complied with the legislative intent behind the safe-release defense. Did appellant choose to release J.G. and not do further harm? Looking to the facts of this case, several indicate that appellant released J.G. in a safe place:

- J.G. was released at the location where every day she walked to by herself, waited for the bus by herself, and was dropped off by the bus driver.[30]

- The location of release was a short walk from J.G.'s home, a walk that she took every day.[31]

- Appellant released her during daylight hours at about the same time she would normally be returning from school.

- J.G. was not physically injured.[32]

- Appellant released J.G. at the driveway to her complex, and not down the road, because she told appellant that she knew how to get home from that driveway. Appellant obeyed her.

- The driveway did not have heavy traffic.

- J.G. passed a mailman and did not ask for help but testified that she would have, had she needed help.

- J.G. was able to call her mother from a neighbor's phone, and J.G. did not tell the neighbor that she needed help.[33]

- A police officer testified that the neighborhood was not known for violent crime.

However, there are also facts that arguably show that J.G. was not released in a safe place:

- J.G. was returned to the same place that she was abducted from.[34]

- Appellant took J.G.'s cell phone and did not return it.[35]

30. See Huff v. State, 2012 Ark. 388, 423 S.W.3d 608, 611 (2012) (stating that the victim's familiarity with the location of release is a factor to be considered but is not conclusive).

31. See Thornburg v. State, 699 S.W.2d 918, 921 (Tex.App.–Houston [1st Dist.] 1985, no pet.) (10–year–old victim not released in a safe place when left alone at night in an unfamiliar neighborhood 25 miles from home).

32. See State v. Stewart, 175 Mont. 286, 573 P.2d 1138, 1147 (1977) (airman not released in safe place when left in his barracks when injured, bound, gagged, and with two of defendant's accomplices still present).

33. See State v. Wright, 990 N.E.2d 615, 619 (Ohio Ct.App.2013) (location was safe when victim released in the parking lot of her apartment complex within walking distance of a friend's apartment).

34. Compare Storr v. State, 126 S.W.3d 647, 652–53 (Tex.App.–Houston [14th Dist.] 2004, pet. ref'd) (trial counsel ineffective for failing to seek instruction on safe-release defense when "the evidence conclusively establishes that appellant voluntarily released the complainant in a safe place"; defendant released complainant in complainant's car at a post office, the site of abduction) with Howard v. State, No. 12–08–00420–CR, 2011 WL 1390002, at *3 (Tex.App.–Tyler Apr. 6, 2011, no pet.) (not designated for publication) (woman abducted from and returned to restaurant where she worked not left in safe place because she was injured and traumatized from sexual assault).

35. See State v. White, 127 N.C.App. 565, 492 S.E.2d 48, 53 (1997) (holding victim released in safe place when taken to a motel and given change to use a pay phone).

- J.G. was nine years old and was returned to a private driveway alone.[36]

- J.G. returned to an empty house that did not have a phone for her to call for help.[37]

- The driveway was "desolate" in that it was surrounded by a park and an unfinished commercial development.[38]

These latter facts demonstrate that the jury's rejection of the safe-release defense was based upon legally sufficient evidence.[39] There is some evidence to support the jury's finding. However, some evidence does not equate to factually sufficient evidence. A proper factual-sufficiency review would include consideration of the purpose of the safe-release defense and whether appellant acted in accord with that purpose.

The court of appeals reviewed many factors in conducting its sufficiency review, which was appropriate, but it did not analyze § 20.04 itself, and it did not consider whether appellant complied with the legislative intent. Appellant kidnapped a nine-year-old girl at knifepoint, which was a violent crime. However, appellant did not physically or sexually abuse the child, and he decided to take her back home. In fact,

he took her to the very place that she indicated was familiar to her and from which she could easily get home by herself and without further harm. It would seem, at least on the surface, that appellant acted precisely in accord with the purpose and rationale of the safe-release affirmative defense.

The bottom line is, did appellant do what the legislature intended § 20.04(d) to encourage kidnappers to do? Did he affirmatively choose to "release the victim and not . . . inflict any further harm?"[40] Because the lower court did not answer this question, I would reverse and remand to the court of appeals to apply the correct factual-sufficiency standard and consider the purpose of the safe-release defense. Therefore, I respectfully dissent.

---

36. *See State v. Sakobie,* 157 N.C.App. 275, 579 S.E.2d 125, 130 (2003) (5–year–old victim was not released in a safe place when he was left alone on the doorstep of a mobile home when the victim was unfamiliar with the location and the defendant did not know whether anyone, much less the victim's mother, was inside).

37. *See Wiley v. State,* 820 S.W.2d 401, 411 (Tex.App.–Beaumont 1991, no pet.) (holding that the victim must be released in a place where aid is readily available).

38. *See Wray v. State,* Nos. 03–01–00626–CR, 03–01–00627–CR, 2002 WL 31525288, at *3 (Tex.App.–Austin Nov. 15, 2002, no pet.) (not

designated for publication) (victim not released in safe place when left barefoot, injured, and intoxicated in the middle of the night "out in the country" populated only with scattered trailer houses and a bait shop).

39. *See Matlock v. State,* 392 S.W.3d 662, 673 (Tex.Crim.App.2013) (noting that when there is some evidence to support the jury's rejection of the defendant's affirmative defense, there is no need to determine whether the affirmative defense was established as a matter of law).

40. MODEL PENAL CODE § 212.1 cmt. 5 at 233 (Official 1962 Draft and Revised Comments) (The American Law Institute 1980).